**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HECTOR FURMENT, individually and on behalf of all others similarly situated, | Case No. 1:25-cv-4730 |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |
| RBG MANAGEMENT CORP. and MORTON WILLIAMS SUPERMARKETS, INC., | |
| Defendants. | |

Plaintiff Hector Furment, by and through his undersigned counsel, files this Class Action Complaint individually and on behalf of a class of all similarly situated persons against Defendants RBG Management Corp. and Morton Williams Supermarkets, Inc. (collectively, "Morton Williams" or "Defendants"). Plaintiff bases the following allegations upon information and belief, investigation of counsel, and their own personal knowledge.

I.   **NATURE OF THE ACTION**

1.    Plaintiff brings this action against Morton Williams for their failure to properly secure and safeguard highly valuable, protected, personally identifiable information including, *inter alia*, payroll information, accounts payable information, accounts receivable and accounting data, social security numbers, bank account information, and addresses of its employees (collectively, "PII"); and for their failure to comply with industry standards to protect information systems that contain PII.[1]

2.    Morton Williams is a food retailer with seventeen locations in the New York City Metropolitan Area.[2]

---

[1] *See* Exhibit A – Notice of Data Breach.
[2] *Our Locations*, Morton Williams, https://www.mortonwilliams.com/our-locations (last visited June 5, 2025).

3.    In order to work at Defendants' supermarkets, Morton Williams's employees are required to directly or indirectly entrust Morton Williams with their PII, which Morton Williams uses in order to perform their regular business practices, including payroll for its employees.

4.    Morton Williams therefore knowingly collects and stores sensitive PII of their employees, and has a resulting duty to secure such information from unauthorized access and exfiltration.

5.    Despite their duties to safeguard its employees' PII, on April 25, 2024, Morton Williams became aware of a cybersecurity incident as a hacker broke into Morton Williams's computer servers at their corporate office, locked the office computers, and downloaded stored information of individuals who were employed there at least four years prior to this date (the "Data Breach" or "Breach").[3]

6.    As a direct and proximate result of Morton Williams's negligent failure to implement and follow basic security procedures, Plaintiff's and Class Members' PII—payroll information, accounts payable information, accounts receivable and accounting data, social security numbers, bank account information, and addresses—is now in the hands of cybercriminals.

7.    Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, and other harms caused by the unauthorized disclosure of their PII—risks which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

---

[3] Exhibit A.

2

8.     Plaintiff brings claims for negligence, unjust enrichment, and declaratory judgment, seeking damages and injunctive relief, including the adoption of reasonably sufficient data security practices to safeguard the PII in Defendants' possession in order to prevent incidents like the Data Breach from reoccurring in the future.

## II.     PARTIES

9.     Plaintiff Hector Furment, at all relevant times, is and was a citizen of the State of New Jersey. Plaintiff was employed as a sales stock associate at one of Defendants' locations from 2017 to 2020.

10.     Defendant RBG Management Corp. is a New York corporation with a principal place of business located at 15 East Kingsbridge Road, Bronx, NY 10468. RBG Management Corp. does business under the name Morton Williams Supermarkets. Defendant RBG Management Corp. is a citizen of New York.

11.     Defendant Morton Williams Supermarkets, Inc. is a New York corporation with a principal place of business located at 15 East Kingsbridge Road, Bronx, NY 10468. Defendant Morton Williams Supermarkets, Inc. is a citizen of New York.

## III.     JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, because Plaintiff and at least one member of the Class, as defined below, are citizens of a different state than Defendants, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

13.     This Court has general personal jurisdiction over Defendants because both Defendants are citizens of the State of New York.

14.     This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b)(1), because Defendants reside in this District, a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District; and Defendants conduct substantial business within this District.

IV.     **FACTUAL BACKGROUND**

    A.     **Morton Williams's Stores Highly Sensitive Data.**

15.     Morton Williams is a grocery supermarket with sixteen stores located in New York City and one in New Jersey.[4]

16.     As part of their employment practices, Morton Williams is entrusted with their employees' PII. This sensitive PII includes but is not limited to, *inter alia*, payroll information, accounts payable information, accounts receivable and accounting data, social security numbers, bank account information, and addresses.

17.     When entrusting Morton Williams with their PII, Plaintiff and Class Members reasonably expect Defendants would use the utmost care to keep this information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

18.     However, despite Defendants' commitment to data security, Morton Williams failed to adopt reasonable measures to prevent the unauthorized access to Plaintiff's and Class Members' PII by unauthorized bad actors.

---

[4] *Our Locations*, *supra* n. 2.

**B.      The Data Breach.**

19.      On or about April 24, 2025, Morton Williams became aware of a potential cybersecurity incident as a hacker remotely broke into Morton Williams's computer servers at their corporate office, locked the office computers, and downloaded stored information.[5]

20.      While the hacker was unable to access data stored in Morton Williams's cloud servers, information from four or more years prior to the date of the Data Breach was compromised.[6]

21.      The impacted information includes payroll information, accounts payable information, accounts receivable and accounting data, social security numbers, bank account information, and addresses of its employees.[7]

22.      Private assessments of the Data Breach indicate that Morton Williams failed to implement basic steps to safeguard the PII that they were entrusted.

23.      On April 30, 2024, Morton Williams reported the Data Breach to their employees that were affected by this incident.[8]

24.      Upon information and belief, the Data Breach occurred as a direct and proximate result of Morton Williams's intentional, willful, reckless, and/or negligent failure to implement and follow basic security procedures in order to protect their employees' PII. Indeed, had Morton Williams properly maintained and monitored their computer systems that stored the PII, Defendants would have discovered the Data Breach sooner rather than allowing the cybercriminals unimpeded access to access and exfiltrate Plaintiff's and Class Members' PII.

---

[5] Exhibit A.
[6] *Id.*
[7] *Id.*
[8] *Id.*

25.     In any event, the scope of the Data Breach shows the severity of Morton Williams's data security failings. The cybercriminals were able to gain access to Morton Williams's employees' PII. If Morton Williams had even minimal data security measures in place, they would have been able to detect the Data Breach at a point before cybercriminals were able to successfully obtain their employees' data.

**C.     The Value of Private Information and Effects of Unauthorized Disclosure.**

26.     Morton Williams was well aware that the protected PII which they acquire is highly sensitive and of significant value to those who would use it for wrongful, nefarious purposes.

27.     Morton Williams also knew that a breach of their computer systems, and exposure of the PII therein, would result in the increased risk of identity theft and fraud against the individuals whose PII was compromised.

28.     These risks are not theoretical, numerous high-profile breaches have occurred at companies such as Blackbaud, Fortra, Snowflake, Progress Software, Change Healthcare, and Accellion, amongst others, in recent years. These breaches put Defendants on notice that their electronic records would be targeted by cybercriminals.

29.     PII is a valuable commodity to identity thieves. As the Federal Trade Commission ("FTC") recognizes, identity thieves can use this information to commit an array of crimes including identity theft, and medical and financial fraud.[9] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII and other protected financial information on multiple underground Internet websites, commonly referred to as the "dark web."

---

[9] *What To Know About Identity Theft*, FED. TRADE COMM'N CONSUMER ADVICE (Apr. 2021), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited June 5, 2025).

30.    Criminals often trade stolen PII on the "cyber black market" for years following a breach. Cybercriminals can also post stolen PII on the internet, thereby making such information publicly available. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the United States. In 2023, there were 6,077 recorded data breach incidents, exposing seventeen billion records. The United States specifically saw a 19.8% year-over-year increase in data breaches as compared to 2022.[10]

31.    In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[11]

32.    The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and Class Members especially vulnerable to identity theft, tax fraud, credit and bank fraud, and more.

33.    **Social Security Numbers**—Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique social security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

---

[10] *2024 Global Threat Intelligence Report*, Flashpoint (Feb. 29, 2024), https://go.flashpoint.io/2024-global-threat-intelligence-report-download.

[11] *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, INSURANCE INFORMATION INSTITUTE, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited June 5, 2025).

34.     The Social Security Administration even warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.

> If you receive a new Social Security Number, you should not be able to use the old number anymore.

> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[12]

35.     Social Security Numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often social security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

36.     The ramifications of Morton Williams's failure to keep Plaintiff's and Class Members' PII secure are long-lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

---

[12] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

37.     A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice:

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[13]

38.     Even if stolen PII and PHI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Indeed, even where cybercriminals do not gain access to a complete set of an individual's PII during a data breach, cybercriminals can cross-reference two or more sources of PII to marry data available elsewhere with criminally stolen data, resulting in complete and accurate dossiers on individuals. These dossiers are known as "Fullz" packages.

39.     The development of Fullz packages means stolen PII from a data breach can easily be linked to victims' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information (such as emails, phone numbers, or credit card numbers) is not included in the PII stolen in a specific incident, criminals can easily create a Fullz package that links that information together and sell the package at a higher price.

40.     Importantly, once a cybercriminal has a Fullz package, they can use it to commit a host of criminal acts including: credit card fraud, loan fraud, identity fraud, account take overs,

---

[13] Dr. Erika Harrell, *Victims of Identity Theft, 2018*, U.S. DEP'T OF JUST., Bureau of Just. Stat., NCJ 256085 (April 2021), https://bjs.ojp.gov/content/pub/pdf/vit18.pdf.

medical identity fraud, tax refund fraud, and buy now pay later frauds.[14] Most problematic, however, is that cybercriminals in possession of a Fullz package "are difficult to stop with ordinary online security and ID verification measures because they possess all the information needed to get past typical authentication measures."[15]

41.    A poll of security executives predicted an increase in attacks over the next two years from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[16]

42.    Due to high-profile data breaches at other companies, Defendants knew or should have known that their employees' information would be targeted by cybercriminals.

43.    Defendants also knew or should have known the importance of safeguarding the PII with which they were entrusted and of the foreseeable consequences if their data security systems were breached. Morton Williams failed, however, to take adequate cybersecurity measures to prevent the Data Breach and the exfiltration of their employees' PII from occurring.

**D.    Plaintiff and Class Members Suffered Damages.**

44.    The ramifications of Morton Williams's failure to keep their employees' PII secure are long-lasting and severe. Defendants' conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways, including theft of their PII as well as substantial and imminent risk of identity theft and fraud. Plaintiff and Class Members

---

[14] Paige Tester, *What Are Fullz? How Hackers and Fraudsters Obtain and Use Fullz*, DATADOME (Mar. 3, 2024), https://datadome.co/guides/account-takeover/what-are-fullz-how-do-fullz-work/.
[15] *Protection Against Fullz and Fraud*, INTEGRITY (Apr. 18, 2022), https://integrity.aristotle.com/2022/04/protection-against-fullz-and-fraud/.
[16] Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need to Know*, FORBES (June 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864.

must immediately devote time, energy, and money to: (1) closely monitor their bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering, spear phishing, or extortion attacks; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

45.    In 2019, the United States Government Accountability Office ("GAO") released a report addressing the steps consumers can take after a data breach.[17] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options. It is clear from the GAO's recommendations that the steps data breach victims (like Plaintiff and Class Members) must take after a data breach, like Defendants', are both time-consuming and of only limited and short-term effectiveness.

46.    The FTC, like the GAO, recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[18]

---

[17] Government Accountability Off., *Data Breaches* (Mar. 2019), https://www.gao.gov/assets/gao-19-230.pdf.
[18] *See Identity Theft Victim Checklist*, Fed. Trade Comm'n, https://www.identitytheft.gov/Steps (last visited June 5, 2025).

47.    Morton Williams recognizes the certainly impending and increased risk of identity theft and fraud that Plaintiff and Class Members now face as they have stated that they have implemented additional security measures, *i.e.*, upgraded their firewall, applied remote access patches, and changed passwords to more complex combinations. Morton Williams has further encouraged individuals to place a free fraud alert on their credit files and consider placing a free credit freeze.[19]

48.    Further, once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse.

49.    It must also be noted there may be a substantial time lag—measured in years— between when harm occurs versus when it is discovered, and also between when PIIs stolen and when it is used. According to the GAO, which has conducted studies regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[20]

50.    For these reasons, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendants' conduct.

51.    The value of Plaintiff's and Class Members' PII has been diminished by its exposure in the Data Breach. Indeed, PII is a valuable commodity to identity thieves, and, once it has been compromised, criminals will use them and trade the information on the cyber black market for years thereafter.[21]

---

[19] Exhibit A.
[20] *See* 2007 GAO Report, at 29.
[21] *The Price Cybercriminals Charge for Stolen Data*, Trustwave (Aug. 6, 2023), https://www.trustwave.com/en-us/resources/blogs/spiderlabs-blog/the-price-cybercriminals-charge-for-stolen-data/.

52. The reality is that cybercriminals seek nefarious outcomes from a data breach, and stolen PII can be used to carry out a variety of crimes.

53. Plaintiff and Class Members are also at a continued risk because their information remains in Defendants' systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as Defendants fail to undertake the necessary and appropriate security and training measures to protect their employees' PII.

54. As a result of Morton Williams's failures, Plaintiff and Class Members face an increased risk of potential scams, identity theft and fraud, and related cybercrimes because of the Data Breach. Those impacted are under heightened and prolonged anxiety and fear, as they will be at risk of falling victim to cybercrimes for years to come.

55. Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private information to strangers and cybercriminals.

**E. Plaintiff's Experience.**

56. Plaintiff was employed as a sales stock associate at one of Defendants' locations from 2017 to 2020. As part and parcel with employment, Plaintiff was required to entrust Morton Williams with his PII. In collecting and maintaining the PII of Plaintiff, Defendants undertook a duty to act reasonably in their handling of Plaintiff's PII. Morton Williams, however, did not take reasonable care of Plaintiff's PII, leading to its exposure and compromise as a direct result of Defendant's inadequate data security measures.

57. Around the time of the Data Breach, an unauthorized third party accessed Plaintiff's Capital One checking account and transferred out some of its funds. Additionally, he had unauthorized purchases at an Ed Hardy store in South Carolina.

58.     Since the announcement of the Data Breach, Plaintiff has been required to spend his valuable time and effort taking steps to avoid potential scams attempting to gain access to his account and mitigate the risk of misuse of his PII. Specifically, Plaintiff has been required to spend his valuable time and effort freezing his checking account and opening new accounts. Plaintiff would not have had to engage in these time intensive efforts but for the Data Breach.

59.     Plaintiff has suffered actual injury from having his PII exposed and/or stolen as a result of the Data Breach, including: (a) mitigation efforts to prevent scammers accessing his account; (b) mitigation efforts to prevent the misuse of his PII; (c) damages to and diminution of the value of his PII, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; and (d) loss of privacy.

60.     Given the nature of the information compromised in the Data Breach and the propensity of criminals to use such information to commit a wide variety of crimes, Plaintiff faces a significant, present, and ongoing risk of scams, identity theft and fraud, and other identity-related fraud now and into the indefinite future.

61.     In addition, knowing that hackers gained access to his PII and that this information likely has been and will be used in the future for scams, identity theft, fraud, and other nefarious purposes has caused Plaintiff to experience significant frustration, anxiety, worry, stress, and fear.

## V.     CLASS ACTION ALLEGATIONS

62.     Plaintiff, individually and on behalf of all others similarly situated, brings this case individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the class defined as:

> All individuals in the United States whose PII was compromised in the Morton Williams Data Breach (the "Class").

63.    Excluded from the Class are Defendants, their subsidiaries and affiliates, their officers, directors, and members of their officers' and directors' immediate families, any entity in which Defendants have a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of those judicial officers' immediate families.

64.    Plaintiff reserves the right to modify or amend the definition of the proposed Class prior to moving for class certification.

65.    **Numerosity.** The class described above is so numerous that joinder of all individual members in one action would be impracticable. The disposition of the individual claims of the respective Class Members through this class action will benefit both the parties and this Court. The exact size of the Class and the identities of the individual members thereof are ascertainable through Defendants' records, including, but not limited to, the files implicated in the Data Breach. Upon information and belief, the Class, at minimum, comprises over a thousand individuals.

66.    **Commonality.** This action involves questions of law and fact that are common to Plaintiff and the Class Members. Such common questions include, but are not limited to:

- Whether and to what extend Defendants had a duty to protect the PII of Plaintiff and Class Members;

- Whether Defendants were negligent in collecting and storing Plaintiff's and Class Members' PII;

- Whether Defendants had duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

- Whether Defendants took reasonable steps and measures to safeguard Plaintiff's and Class Members' PII;

- Whether Defendants failed to adequately safeguard the PII of Plaintiff and Class Members;

- Whether Defendants breached their duties to exercise reasonable care in handling Plaintiff's and Class Members' PII;

- Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

- Whether Plaintiff and Class Members are entitled to damages as a result of Defendants' wrongful conduct; and

- Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

67.    **Typicality.** Plaintiff's claims are typical of the claims of the Class Members. The claims of Plaintiff and Class Members are based on the same legal theories and arise from the same failure by Defendants to safeguard their PII. Plaintiff and Class Members entrusted Defendants with their PII, and it was subsequently accessed by an unauthorized third party.

68.    **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the other Class Members Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, the interests of the Class Members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

69.     **Superiority.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

70.     **Predominance.** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendants' liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendants breached their duties and released Plaintiff's and Class Members' PII, then Plaintiff and each Class member suffered damages by that conduct.

71.     **Ascertainability:** Members of the Class are ascertainable. Class Membership is defined using objective criteria, and Class Members may be readily identified through Defendants' books and records.

## VI.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

72.     Plaintiff restates and realleges the allegations contained in paragraphs 1 through 71 as if fully set forth herein.

73.    Defendants owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII in Defendants' possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

74.    Specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendants' security systems to ensure that Plaintiff's and Class Members' PII in Defendants' possession was adequately secured and protected; (b) implementing processes that would detect a breach of their security system in a timely manner; (c) timely acting upon warnings and alerts, including those generated by their own security systems, regarding intrusions to their networks; and (d) maintaining data security measures consistent with industry standards.

75.    Morton Williams's duty to use reasonable care arose from several sources, including but not limited to those described below.

76.    Defendants had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendants. By collecting and storing valuable PII that is routinely targeted by criminals for unauthorized access, Morton Williams was obligated to act with reasonable care to protect against these foreseeable threats.

77.    Defendants also owed a common law duty because their conduct created a foreseeable risk of harm to Plaintiff and Class Members. Morton Williams's conduct included their failure to adequately restrict access to their computer networks and/or servers that held individuals' PII.

78.    Defendants also knew or should have known of the inherent risk in collecting and storing massive amounts of PII, the importance of implementing adequate data security measures

18

to protect that PII, and the frequency of cyberattacks such as the Data Breach in the financial sector.

79.    Defendants breached the duties owed to Plaintiff and Class Members and thus was negligent. Morton Williams breached these duties by, among other things: (a) mismanaging their system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII; (b) mishandling their data security by failing to assess the sufficiency of their safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust their information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow their own privacy policies provided to employees; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII.

80.    But for Morton Williams's wrongful and negligent breach of their duties owed to Plaintiff and Class Members, their PII would not have been accessed, exfiltrated, and compromised by cybercriminals.

81.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered injuries including:

        a.    Theft of their PII;

        b.    Costs associated with requesting credit freezes;

        c.    Costs associated with the detection and prevention of identity theft;

d.      Costs associated with purchasing credit monitoring and identity theft protection services;

e.      Lowered credit scores resulting from credit inquiries following fraudulent activities;

f.      Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach;

g.      The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

h.      Damages to and diminution in value of their PII entrusted to Morton Williams with the mutual understanding that Defendants would safeguard Plaintiff' and Class Members' data against theft and not allow access and misuse of their data by others; and

i.      Continued risk of exposure to hackers and thieves of their PII, which remains in Defendants' possession and is subject to further breaches so long as Defendants fails to undertake appropriate and adequate measures to protect Plaintiff and Class Members.

82.    As a direct and proximate result of Morton Williams's negligence, including their gross negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### UNJUST ENRICHMENT
#### (On Behalf of Plaintiff and the Class)

83.    Plaintiff restates and realleges the allegations contained in paragraphs 1 through 71 as if fully set forth herein.

84.    Plaintiff and Class Members conferred a monetary benefit on Morton Williams by providing them with their valuable PII.

85.    Morton Williams knew that Plaintiff and Class Members conferred a benefit upon them and accepted and retained that benefit by accepting and retaining the PII entrusted to them. Defendants profited from Plaintiff's and Class Members' PII and use of Plaintiff's and Class Members' PII for business purposes.

86.    Defendants failed to secure Plaintiff's and Class Members' PII and, therefore, did not fully compensate Plaintiff or Class Members for the value that their PII provided.

87.    Morton Williams acquired the PII through inequitable record retention as they failed to disclose the inadequate data security practices previously alleged.

88.    If Plaintiff and Class Members had known Defendants would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would not have agreed to the entrustment of their PII to Defendants.

89.    Under the circumstances, it would be unjust for Morton Williams to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon them.

90.    Plaintiff and Class Members are without an adequate remedy at law.

91.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered injuries, including those identified in paragraph 81 above.

92.    Plaintiff and Class Members are entitled to restitution and/or damages from Morton Williams and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct, as well as return of their sensitive PII and/or confirmation that it is secure. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

**THIRD CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiff and the Class)**

93.     Plaintiff restates and realleges the allegations contained in paragraphs 1 through 71 as if fully set forth herein.

94.     Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described herein.

95.     An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and whether Morton Williams is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff alleges that Defendants still possess Plaintiff's and Class Members' PII, and that Defendants' data security measures remain inadequate. Furthermore, Plaintiff and Class Members continue to suffer injury as a result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

96.     Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

        a.     Defendants owe a legal duty to secure the PII under the common law and Section 5 of the FTC Act; and

        b.     Defendants continue to breach this legal duty by failing to employ reasonable data security measures to safeguard Plaintiff's and Class Members' PII.

97.     This Court also should issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with law and industry standards to protect the PII in their possession.

98.     If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Morton Williams. The risk of another such breach is real, immediate, and substantial. If another breach at Morton Williams occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

99.     The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. Plaintiff and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

100.    Issuance of the requested injunction will not disserve the public interest. On the contrary, such an injunction would benefit the public by preventing another data breach at Defendants, thus eliminating the additional injuries that would result to Plaintiff and Class Members whose confidential information would be further compromised.

**VII.    <u>PRAYER FOR RELIEF</u>**

WHEREFORE Plaintiff, individually and on behalf of all others similarly situated, prays for relief as follows:

A.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representatives of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

C.    For damages in an amount to be determined by the trier of fact;

D.    For an order of restitution and all other forms of equitable monetary relief;

E.    Declaratory and injunctive relief as described herein;

F.    Awarding Plaintiff' reasonable attorneys' fees, costs, and expenses;

G.    Awarding pre- and post-judgment interest on any amounts awarded; and

H.    Awarding such other and further relief as may be just and proper.

## VIII.  **JURY TRIAL DEMANDED**

A jury trial is demanded on all claims so triable.

Dated: June 5, 2025                              **LYNCH CARPENTER, LLP**

                                                  */s/ Gary F. Lynch*
                                                  Gary F. Lynch (NY 5553854)
                                                  gary@lcllp.com
                                                  Nicholas A. Colella (*pro hac vice* forthcoming)
                                                  nickc@lcllp.com
                                                  1133 Penn Ave., 5th Floor
                                                  Pittsburgh, PA 15222
                                                  Telephone:    (412) 322-9243
                                                  Facsimile:    (412) 231-0246

                                                  *Attorneys for Plaintiff and the Proposed Class*